Our next case is ACC Construction Company, Inc. v. Secretary of the Army, 23-1372. All right, Mr. Scott, you have reserved three minutes for rebuttal, and we're ready when you are. Thank you. May it please the Court. So we have two questions to talk about here today. One is a question of fact, and that question is, did the government know before it published the solicitation that this project site was going to be considered a hotspot requiring significant extra stormwater treatment requirements? And the second is, if that's the case, if the government did know that information, does the Permits and Responsibilities Clause relieve the government of its obligation to disclose that knowledge to a contractor? Doesn't that clause place an obligation on you to understand what's necessary to get the adequate permitting? It certainly does, Your Honor, and ACC doesn't take the position, in fact, that it's not subject to the requirements of the clause or that the clause has been misapplied in particular. But what the clause doesn't do is place onto a contractor the risk that the government will not meet other of its contracting obligations, in this case, its obligation to disclose superior knowledge. The Permits and Responsibilities Clause comes from a policy of clear risk allocation, and for the work that it does, it is very clear. All work or all risk for requirements that are outside the direct control of the contracting agency falls to the contractor. That's not particularly surprising. It's clear. It's been well-known for decades. In this case, though, we believe- Is there evidence that the government knew this was or was likely to be a hotspot? There are two particular issues. The first was back in July of 2015. The Real Property Planning Board for Fort AP Hill, where the project was located, identified the project site as industrial, and it's shown on a map, and the map is- we've cited it in the record, but it shows- it's outlined as industrial. The legend on the industrial on that map, it shows a number of things. It shows paved and heavily paved, and then unpaved areas. It shows paved and unpaved parking, storm ponds, and wetlands. Those are all things that the Virginia DEQ, the Department of Environmental Quality, would also consider when making a determinant of whether the project site is a hotspot. In addition to that, this information was propagated by the Department of- the Planning Board for Fort AP Hill, but it was specifically then passed on a number of times until it got to the Army Corps, who is the contracting agency in this case. Our position is, if it's not important, why is the government passing it on repeatedly inside, internally? This meant something to them, and our contention is that it was more than just the zoning for it to be industrial or non-industrial. As far as we're concerned, once the Army tells the Army Corps where to build, all the Army Corps has to do is then build on that spot. The zoning is outside the responsibility of the Army Corps. That's the first piece of evidence, Your Honor. The second piece- All in all, the record does not show any evidence that the government knew that this was an industrial hotspot. We disagree with that, Your Honor. The board made a finding, right? That's specifically one- To win, you don't have to just show evidence to the contrary. You have to show that no reasonable person could reach that finding. If there's evidence to support the board's finding, then we don't have to reach this legal issue about a supposed conflict between superior knowledge and the permit requirement because there's no superior knowledge. That's correct, Your Honor. That's right. To your question about the record including information that there was knowledge, I've spoken about the first piece, the industrial designation. Yes, the government makes a point that that is not the DEQ's designation of the project site. We don't maintain that it is. What we maintain is that it was important because if ACC had known that the government understood that this project was going to require heightened stormwater management requirements, it would have designed its project differently and it would have looked at the requirements differently. There are public requirements, particularly in Table 8.10- The government didn't know. This is the problem. The board found the government didn't know that this was going to be ... I'm a little confused. I want to make sure we use the right terms. Ultimately, didn't Virginia find that this was a non-industrial hotspot? That's correct. That's the superior knowledge that you're claiming the government knew about? Not quite, Your Honor. The superior knowledge that we are claiming that the government had is that the site would require increased stormwater management factors, is what they call it in Virginia. Whether it's an industrial hotspot or a non-industrial hotspot, ACC didn't believe that it was either one of those. It didn't believe that for a number of reasons. The first is that its designer of record had designed a site functionally identical to this one on Fort A.P. Hill, subject to the same DEQ regulations, and that it wasn't ... DEQ found it wasn't a hotspot. The problem is that the federal government didn't know how Virginia was going to characterize this. The federal government- I mean, the evidence you just cited to me, that there'd been another project that wasn't considered a hotspot, would lead me to think that the government also maybe thought this wasn't a hotspot. The government had an idea that there were going to be heightened stormwater management requirements on this project. It's not enough to know that there might be heightened. They put that in the contract, that there are stormwater regulations. You have to make sure you comply with that. If what we're talking about in superior knowledge is the specific piece of superior knowledge that required you to get additional cost, which is that Virginia ultimately found this to be a non-industrial hotspot, there's no evidence that the government ever knew that Virginia would characterize this as a non-industrial hotspot, right? There was an email in January of 2016 that was sent to Mr. Michael Higgins, who was the personnel within the Army Corps. Do you have an appendix page? It looks like you're reading from something. Do you have an appendix page? Yeah. It's appendix 1115. The determination was, there will be significant stormwater management that must be addressed. Now, significant stormwater management, that means something above the normal. That's a hotspot. Did the contract not specify that there were stormwater regulations that were applicable to this? That was your responsibility? Well, our position is that- Why does significant stormwater issues translate to knowledge of non-industrial hotspot? It's important that the government was sending this information internally to the folks who were on the project, because otherwise, everybody knew there were already stormwater requirements. Like you said, it's in the solicitation. The note here is that they're significant. That means there's something other than what's already in the solicitation. The government had an idea that the solicitation- The solicitation said you have to comply with whatever Virginia does, so everything was in the solicitation. Well, what wasn't in the solicitation, that the project will require significant stormwater requirements. In other words, over and above the standard non-hotspot. You're laying an awful lot of weight on the word significant in an email to connect it to the increased cost from non-industrial hotspot that the government didn't know of. Is there any evidence that the ... Because you may say it's significant, that doesn't show the government knew of exactly what was going to happen here. That's what you have to show for superior knowledge, isn't it? Yes, it is. Our position is that these two pieces of evidence show that the government did know something. The board cited a bunch of things about why the government didn't know. The board cited evidence of what happened after the fact. All that's evidence of is that it happened after contract award. When you bid on the contract, you represented this consulting group that you hired, Mason and Hager, that they were, quote, a design team that has experience coordinating with Ford, AP, Hill, and Baltimore, and Chesapeake Bay office in the Commonwealth of Virginia. Shouldn't they have told you, or shouldn't they have known that what you were working with was a non-industrial hotspot, or simply something that would require this remedial lining for the water running off? This goes back to the designer, Mason and Hager, their experience. As I mentioned, they had designed a project that's functionally similar to this one. The important piece here is the aggregate parking lot, which, for the record, was specified by the government. This aggregate parking lot is specified by the government. Mason and Hager had done another project on the same facility, subject to the same DEQ regulations, and it wasn't determined to be a hotspot. What that tells us is that even though there was... That alerts them to the fact that it could be a hotspot, that Virginia could decide that this particular project involved a hotspot, and you held this group out as having certain expertise in this very question that we're talking about. Part of their expertise, your honor, is their experience doing projects just like this one. It seems illogical that we would expect DEQ's behavior to change from one project to the other when the basic specifications... Have you ever tried to build a house in a historic zone, or anything like this? They change their mind all the time. That's why, how can you expect to impute knowledge of what Virginia was going to do to the federal government at the time of the solicitation award? There's no evidence in the record that the government knew that Virginia would characterize this project in any specific way. Is there? In a specific way, no, but they did know that it would require something additional in terms of being a hotspot, because there was something that they understood there as important. Like I said, why would they transmit that information that it was an industrial site all the way up to the Army Corps? That was important for some reason. Are you saying that the Mason people also didn't understand that stormwater permitting was important? No, that's not what at all what we're saying. That's all the government knew, that it was important. You just said that. If they knew it was important, and they knew that they were going to have to get approval from Virginia, they had the exact same knowledge that the government had. What I'm saying was important, primarily, is the fact that the government considered it an industrial site. That's not information that ACC, or its designer of record, had, or could have had. All of that information was within the government's... We know from the record that use of the phrase, industrial, is not the Virginia stormwater use of industrial. It's a different thing. They weren't talking about stormwater when they were talking about that. That may be so, but what it says is that the government... Doesn't that make that evidence not relevant to the substantial evidence question here? No, I think it does make it relevant when you consider it with the other evidence that the government had knowledge that this site was going to be treated differently than a non-hotspot that didn't require a permit. You point us to appendix page 1115, is there anything else you would point us to to support up your arguments you're making here today about the knowledge? Yeah. Well, the only other knowledge that we can point to is, very shortly after award, a number of government employees identified this as a hotspot or an industrial spot. Those occurred after award. We believe that they had knowledge of that beforehand, but the record doesn't have evidence of that in it, so we certainly can't cite that. So our knowledge, our facts, that the government knew of this, are not perfect, but we think that they are sufficient enough to show a reasonable person would think that the government did know something was happening here. But are they sufficient to show that no reasonable person could find that the government didn't have knowledge? Your Honor, I don't believe... That's the standard. I don't believe the standard is... You have really sketchy evidence that would support your finding if the board had ruled in your favor, but there has to be a complete lack of evidence supporting the board's finding, and the government's going to get up here in a minute or so and point to evidence that supports the board's finding, and we can't re-weigh the evidence. I mean, we've presented the evidence that we have in the record. You presented it to the board. The board disagreed with you. That's why we're here, Your Honor. Well, yeah, but we don't get to make a new factual finding, and if there's substantial evidence on both sides, then you lose. Well, we think that there isn't substantial evidence that the government didn't know something before award. The only evidence in the record is that... That's not the right standard. Didn't know something? Didn't know that this was going to be a non-industrial hotspot? So I misspoke, Your Honor. We don't believe that the record shows that, you know, with any sort of certainty that the government didn't know this would be a hotspot before award, or before the solicitation was issued. Okay, you're into your rebuttal time. Do you want to save it, or... I will save it, Your Honor. Thank you. We'll restore your time back. May it please the court, the board correctly rejected ACC's superior knowledge claim. The record shows in substantial evidence supports that the government never had the knowledge asserted by ACC, and there can be no superior knowledge situation here because ACC had a contractual obligation through numerous statements in the solicitation on top of the permits and responsibilities clause to find out through publicly available information. I want you to tell me what the substantial evidence is, but let me ask you, could you just raise the legal question first. If the government had superior knowledge, the permits clause wouldn't excuse you of a superior knowledge claim, would it? No, Your Honor, and the board didn't even reach that finding in the first place. But they're mutually exclusive areas. If the government has superior knowledge, then it's something the contractor wouldn't be able to find out under its permits and responsibilities clause responsibilities. So we're not... The board didn't even discuss that issue because it found there was no superior knowledge in the first place. And what's the evidence supporting that finding? There's several things, Your Honor. First of all, what ACC is relying on is how the Fort AP property planning board, which is not the Corps, designated the site as industrial for base planning purposes. And that was, you know, to make sure that certain types of buildings that don't go well together are not next to each other. I think the board said, you know, so a firing range is not next to the dorms. Calling it industrial, using that terminology for base planning purposes, is not the same thing as DEQ designating it as a stormwater permitting hotspot. There's no evidence that DEQ, nothing that the DEQ regulation says what other bodies call a site has any relevance to its permitting. And there's... Is this made on a case-by-case basis, the decision of whether something is a hotspot or not? I mean, DEQ has its specifications, and in fact, a very important specification here is Table 8.10, which is in Appendix 1026, and it's a list of potential stormwater hotspots that DEQ has made publicly available. So any company or its designer that claims to be experienced can look at that table and say, am I building one of these things? Does my thing have these features? And then they should be able to tell if it is going to be a hotspot or not. And one of those items is parking lots of over 40 spots. So here, the design had a 900-spot parking lot. So if DEQ did something inconsistent in the past and didn't apply its regulations in a certain way, I think that's a classic Bell-Heary situation where that's not the responsibility of the federal government. It's within the Permits and Responsibilities Clause for the contractor to work that out. Maybe it would have alerted, and you're right, it would have alerted the contractor to the potential that this is a non-industrial hotspot, but also for the government, right? I mean, everyone had the same level of knowledge. The superior knowledge... This is what I find incredible about the case is that everybody seemed to know that the potential for this to be classified as a non-industrial hotspot, that that existed, and yet nobody brought it up. Well, I mean, the government put in the solicitation numerous points that, I mean, for example, it said the permit might take 180 days. The solicitation stated that the site work included stormwater management, including proposed best management practices, and it actually required the offerors to discuss their experience complying with Virginia's stormwater management requirements on projects of this size and said, how is the offeror going to apply for a stormwater permit? So also, I mean, the contractor could have reached out to DEQ ahead of time to discuss this issue and how these specifications might interact with each other. The superior knowledge clause is about disparate knowledge. Right, the fact that everybody knows that the potential defeats the superior knowledge claim, right? Correct. It's not something where... Can you get back to citing... And I know it's hard to prove a negative, so maybe you don't have anything else, but  you knocked down their evidence about why they did have knowledge, which seems perfectly fine. Is there anything specific? Was there testimony or documents or anything where the government said we didn't know about this non-industrial hotspot at the time of award? I don't believe that there's something where someone said we had no idea this could be a non-industrial hotspot, but I think the government has put it in the solicitation that this is something that contractors need to be aware of and be complying with, and that if these regulations are publicly available, it wasn't... So there's nothing in the record. So we say the board made a finding, the government had no knowledge that this was going to be a non-industrial hotspot, right? Right. And there's nothing in the record beyond just inferences because they point to nothing, and it's their burden, I take it, that shows the government had that direct knowledge that it was going to be a non-industrial hotspot. All they can point to is the industrial designation, which it seems like a different kind of issue. It doesn't have anything to do with stormwater, and that there might be significant stormwater issues, which is, I don't know how that rises to the level of superior knowledge on non-industrial hotspots. Right. The contractor, before the board, pointed out several instances where they thought demonstrated the government's knowledge, and the board said these don't show the government's knowledge. The board found that the first time the government considered to be a hotspotter of hotspot issues was after award, when they were reviewing, going over the designs with the contractor's team. So the board made that finding and said, this is the first time this pops up in the record that the government is considering it a hotspot, and there's substantial evidence for that because the things that the contractor points to to say there was some sort of pre-award knowledge are not accurate or do not exist. So that's the board's, that's the substantial evidence is that the board looked at what they said, this is the first time it was being considered a hotspot. I would also point out that the Mason and Hanger stated in its proposal that they were very familiar with the installation, including stormwater requirements, and they actually said that the use of their infiltration areas would meet the stormwater requirements of the Virginia Department of Environmental Quality. So if the contractor is telling the government, our design is going to meet Virginia's requirements, I don't know how they can now say that they had no idea this could possibly be considered a hotspot, or they're just relying on the idea that Virginia would not treat it differently from some other project, and that's not the government's responsibility, that's on the contractor. So would you say that if there's a construction factor that's well-known in the industry or that it cannot be a superior knowledge issue? I mean, I believe that's covered by this court decision in Giesler and also H&N Bailey. If it's something that's, for example, in Giesler, the contract said, you know, we need these mixed nuts, and it had some sort of code that just wouldn't be understandable to you or me, but people in the nut industry would know that's supposed to be a certain mix of peanuts with a certain amount of each kind of nut. So anyone could go look that up and see what's in it, and the same, anyone could look at and say, am I building a parking lot with over 40 spaces? And if you are, then you have hotspot issues. And I mean, separately, but again, I think the solicitation really pointed out numerous times that stormwater needed to be given attention. If they're not using the word significant, that's really a value judgment or a prediction that is not covered by the Permits and Responsibilities Clause either. Is there any case law that you would point us to from this court that would help with the various positions you're putting forth today? Yes, I would say the American Shipbuilders case, Giesler, H&N Bailey, I believe McCormick. Also, as a comparison, for example, the Helene Curtis case, where the court did find superior knowledge. It's a patentable chemical. The government was the one that, the government really was the only company, not company, entity that knew how to make this disinfectant mix. The contractor had no way of figuring that out because they didn't know how to make this stuff through this method that existed. The government was the only one that knew that. That's different than cases where the knowledge is available from an outside source and anyone in the industry that's experienced should be able to find that. And also, I think Giesler, I said, and McCormick, I think I listed them. But again, the superior knowledge doctrine is really about unavailable information. The government, H&N Bailey says the government has no duty to volunteer information if the contractor can reasonably expect it to seek and obtain the facts elsewhere. So if there's no superior knowledge, then Bell-Heary controls here. The Permits and Responsibilities Clause put it on the contractor to comply with the permitting, even if the state agency is being inconsistent or acting in a way they don't expect. There's nothing in the contract that removes that responsibility from the Permits and Responsibilities Clause and puts it back on the government. That's Bell-Heary. So if there's no further questions, then this court should affirm the board. Thank you. So, I'd like to just address a couple of things that the counts have raised. So in terms of knowing that this was a hotspot, clearly that's not the case because ACC, which by the way has built 30 of these facilities, has built 10 of them for the Corps, now granted none of those are in Virginia, but no state has ever designated one as a stormwater hotspot that required any additional concern. Mason and Hanger designed a spot, a site like this, on Fort Apey Hill, subject to DEQ regulations. But this is a non-industrial hotspot. Hotspot or non-industrial hotspot, none of them have been designated any kind of a hotspot. But there is a difference, isn't there? There's a difference in degree. Yeah. That's right. But if ACC had known that there was any kind of hotspot consideration, it would have reconsidered the way that it made a proposal. Why not the parking lot situation? You know it's a parking lot. There's special rules for parking lots for 400 vehicles and you're building one for 900. Well, Table 8.10 is a small snapshot of the entire requirement. That requirement is multiple pages long. It has a lot of instructions about how to apply Table 8.10. And if you look, Table 8.10 is titled Potential Hotspot Uses. Potential. And so ACC's designer had done this before and it had looked at Table 8.10 and it said we did this in the past. It didn't exactly fit in here. It's not just a parking lot. It has other portions of the facility. And so DEQ applied its regulations and it wasn't a hotspot. So we believe this time it will be a similar determination because the facts are effectively the same. So this idea that it's immediately... That's Virginia that's controlling that information and that decision. Well, it's Virginia that's controlling that decision, but the government, we believe, clearly understood something that this site was going to be somehow special. Based upon the use of the word significant and the reference to industrial in a way that was used not relating to stormwater at all? That's the only evidence you've cited to us that the government knew about how Virginia would apply its regulations. That's correct, Your Honor. So I don't believe that the... There's no evidence that the government knew specifically what Virginia would do here, right? I don't believe so, no. But I also don't think that the characterization of the industrial designation is completely divorced from the idea of stormwater management. Like I said, it was passed on to the court for use in its planning. And also the legend on there is all things that would be considered environmental issues, paving, unpaving, stormwater, wetlands. It doesn't have sort of residential and all this other stuff. That's what the legend says. So my time is up. Thank you very much. Okay, we thank you. That concludes the arguments for this morning.